**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 0 7 2012

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| ex rel. Under Seal | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | **1:12-CV-4244** |
| | ) | |
| Under Seal | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

**JBC**

## FILED UNDER SEAL 31 U.S.C. §3730(B)(2)

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America )
)
ex rel. Teresa McAree )
)
    Plaintiff, )
)
    v. )
)
SunDance Rehabilitation Corp. )
)
    Defendant. )
)

**FILED IN CAMERA AND
UNDER SEAL**

Civil Action File No.:

Jury Trial Demanded

## FALSE CLAIMS ACT COMPLAINT

This action is filed pursuant to the Qui Tam provisions of the False Claims

Act, 31 U.S.C. § 3729 et seq., and principles of common law and is based on a

scheme by the Defendant, SunDance Rehabilitation Corporation ("SunDance") and

its officers and directors, to defraud the United States, the Federal Medicare

Program and the American taxpayers of millions of dollars through fraud, waste,

abuse, mismanagement and gross negligence. These acts occurred while

SunDance acted as a provider of skilled therapy services for Medicare and as a

Federal Program contractor responsible for the administration of and provision of

healthcare services that received reimbursement of Medicare claims, under both

Part A and Part B, for skilled therapy services provided to Medicare beneficiaries.

Plaintiff, Teresa McAree acting on behalf of and in the name of the United States of America, alleges as follows.

## Parties

1.     Plaintiff Teresa McAree ("McAree" or "Relator") is a citizen of the United States and a resident of the State of Georgia.  Relator is suing on her own behalf and on behalf of, and in the name of, the United States Government, pursuant to 31 U.S.C. § 3730(b).

2.     The United States administers the Federal Medicare Program through its agency, the Department of Health and Human Services ("DHHS"), and the Center for Medicare and Medicaid Services ("CMS").  CMS is authorized to enter into and administer contracts on behalf of DHHS and the United States.  Inclusive in CMS's contracting authority is the responsibility for administering the Federal Medicare Program and the payment and reimbursement of Medicare claims processed by Medicare contractors.

3.     Defendant SunDance is a Connecticut corporation with its principal business office at 101 Sun Avenue NE, Albuquerque, New Mexico, 87109.  SunDance is licensed to carry on business in Georgia.  SunDance is a wholly owned subsidiary of Sun Healthcare Group, Inc., which was recently acquired by Genesis Healthcare.

2

4.     SunDance is a Medicare provider of skilled therapy services, including speech, occupational, and physical therapy.  SunDance provides therapy services at both skilled nursing facilities ("SNFs") and on an outpatient basis at independent living facilities ("ILFs") and assisted living facilities ("ALFs").  As such, SunDance provides Medicare benefits through both Part A (hospital insurance) and Part B (medical insurance) coverage.  SunDance services patients throughout the Northern District of Georgia and throughout the United States.  As these patients are almost all elderly and very few have private insurance, over 90 percent of these patients have Medicare as their primary insurance.

## Jurisdiction and Venue

5.     This Court has jurisdiction in this matter under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345.

6.     Relator has direct and independent knowledge within the meaning and definition of 31 U.S. C. § 3730(e)(4)(B), derived through and from Relator's employment with SunDance, of all of the information on which the allegations set forth in the Complaint are based, and Relator has voluntarily provided the information contained in the Complaint to the Government through both in-person meetings with the U.S. Attorney and related correspondence in June and July 2012. None of the allegations set forth in this Complaint are based on a public disclosure

3

of allegations or transactions in a criminal, civil or administrative hearing, in a Congressional, administrative or general accounting office report, hearing, audit, investigation, or from the news media.

7.      Venue is proper under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)-(c).

### Federal Medicare Program and Skilled Therapy Services

8.      DHHS, through CMS, provides health insurance to eligible aged and disabled Americans (Medicare beneficiaries) pursuant to the provisions of the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §1395, et seq. The Medicare Program provides health care services and benefits to certain eligible groups such as persons over age 65, disabled persons, and qualifying homebound persons in need of medical/nursing care.  The Medicare Program is administered under two distinct parts.  Medicare Part A, "Hospital Insurance for the Aged and Disabled," covers health care services furnished by hospitals, home health agencies, hospices, and SNFs.  Medicare Part B, "Supplementary Medical Insurance for the Aged and Disabled," covers laboratory services, x-rays, physicians' services and other services, such as outpatient skilled therapy, as well as some other services not reimbursed under Medicare Part A.

9. Patients in a SNF require skilled nursing or skilled rehabilitation services, or both, on a daily basis. Through the Part A hospital insurance benefit, Medicare pays for skilled therapy as a component of skilled nursing care, in either the acute care setting or in a post-hospital SNF. Part A covers skilled therapy services for patients in SNFs if the therapy was ordered by the patient's physician, it is needed for a condition that was treated during a qualifying hospital stay, it is reasonable and necessary for the diagnosis or treatment of the condition, and the services are provided in a SNF that is certified by Medicare. The services also must be such that, as a practical matter, they can only be provided in a SNF or on an inpatient basis.

10. Outpatient skilled therapy is designed to improve, restore and/or compensate for loss of functioning following an illness or injury. Medicare Part B provides coverage and payment for outpatient skilled therapy services under limited circumstances. In order to qualify for reimbursement, outpatient skilled therapy services must: (1) be reasonable and medically necessary; (2) be furnished to a Medicare beneficiary under the care of a physician; (3) be furnished under a plan of care periodically recertified by a physician; and (4) be furnished by or under the direct supervision of qualified personnel.

5

11.    Skilled therapy must be medically necessary. Medical necessity means, in part, that the services must be of a level of complexity and sophistication that they can be safely and effectively performed only by a qualified therapist. Services related to the general welfare of patients, such as a general exercise class, do not constitute skilled therapy.

12.    Outpatient therapy must be provided to *improve* a beneficiary's functioning level. Medicare typically does not cover services provided to *maintain* a beneficiary's existing level of functioning. Thus, if a patient's expected restoration potential would not be significant in relation to the extent and duration of therapy services required to achieve such potential, the therapy would not be considered reasonable and necessary. Similarly, if at any point in the treatment, it is determined that improvement in a patient's condition will not be achieved, the services no longer will be considered reasonable and necessary.

13.    Skilled therapy services billed to Medicare also must be furnished in accordance with a sufficient plan of care established by a physician or by the licensed physical therapist who performs the services. Under applicable Medicare regulations, the plan must prescribe the type, amount, frequency, and duration of the skilled therapy services to be provided to the individual and indicate the diagnoses and long-term goals. The therapy service must be appropriate for the

6

beneficiary's condition and reasonable in terms of frequency and duration under accepted standards of practice. In Georgia, all plans of care must first be approved by a physician.

14.    Under Medicare regulations, the plan of care must be certified by a physician who has knowledge of the case (if the plan of care is established by a therapist), as soon as possible after the plan of care is established and periodically re-certified thereafter. Recertification is required at least every 90 days and must explain why continued therapy services are necessary.

15.    All skilled therapy services are billed using the Healthcare Common Procedure Coding System ("HCPCS") codes.

16.    In addition, Medicare Part B imposes a monetary cap for therapy services. These therapy caps originally were passed as part of the Balanced Budget Act of 1997 in an effort to reduce Medicare spending. The caps are determined on a calendar-year basis. Thus, a beneficiary's services begin counting toward the cap on January 1.

17.    In 2011, a patient had $1,870 for the entire calendar year for physical therapy and speech therapy. This cap applied to both kinds of therapy; there is not a separate cap for each. There is a separate $1,870 cap for occupational therapy. In 2012, these two caps increased to $1,880.

7

18.    As part of the Deficit Reduction Act of 2006, Congress passed legislation authorizing CMS to create and employ an exceptions process to permit medically necessary skilled services above the cap.

19.    Providers may exceed a beneficiary's cap if the services are medically necessary and are supported by medical record documentation. This documentation must be supported by appropriate exception codes (called "KX modifiers") showing why an exception is necessary. For example, an appropriate use of an exception code would be if someone broke his or her leg in January, exhausted all their Medicare therapy benefits for the year, and then broke his or her arm in July.

20.    Providers should use the KX modifier only when services are *expected* to exceed the cap. Use of the modifier when there is no indication that the cap is likely to be exceeded is abusive.

21.    At all times pertinent to this Complaint, SunDance would apply to CMS for reimbursement under both Medicare Part A and Part B for skilled therapy services. These services would be documented in such a fashion as to purportedly justify and substantiate a basis to qualify for billing under Medicare and these charges would then be processed by SunDance through CMS.

8

22.    SunDance engaged in a number of activities that are violative of the False Claims Act and the requirements and constraints imposed by DHHS and CMS.  As more fully explained below, SunDance managers engaged in a pattern and practice of harassing and intimidating behavior towards SunDance therapists, who provided services in both Part A and Part B settings, in an effort to have therapists increase the lengths of stays of their patients and the frequency of per-week visits a patient received.  SunDance also urged its therapists to avoid a "cap mentality" and instead, to use "strong codes" in order to exceed the Medicare cap. Through these practices, SunDance increased the profitability of its facilities.

23.    The kinds of fraudulent billing practices engaged in by SunDance include but are not limited to:

- Upcoding;

- Billing for unskilled and maintenance services such as general exercise classes;

- Billing for services to exceed the Medicare cap without obtaining appropriate power-of-attorney consent;

- Disregarding and exceeding the Medicare cap without medical necessity; and

9

- Increasing lengths of stay and frequency of visits per week without medical necessity.

## **Factual Allegations**

24.    The Relator incorporates by reference herein each and every allegation and statement contained in the paragraphs stated herein above.

25.    SunDance has been a for-profit national rehabilitation provider since 1990. SunDance employs over 5,000 licensed professional physical, speech, and occupational therapists who provide skilled therapy services to patients in over 38 states at a variety of facilities, including SNFs, ILFs, ALFs, and hospitals.

26.    When SunDance begins providing services at an ILF or ALF, it moves into already-existing buildings. Sundance refers to this as "opening" a building.

27.    SunDance maintains a core treatment philosophy of "resident advocacy" that purportedly focuses on quality of life for residents of SNFs, ILFs, and ALFs. SunDance describes its resident advocacy philosophy as a "proactive care and intervention philosophy" that empowers staff to bring to the attention of therapists any resident who is experiencing difficulty or has had a decline in function. For SunDance, it is important that resident advocacy "resonate" within its centers.

10

28.   Under this philosophy, to which SunDance asks its therapists to "commit," therapists are trained to constantly find ways to use therapy to improve a resident's daily life.  These ways could include increased lengths of stay, more intense therapy sessions or longer therapy sessions, and attention to all resident incidents or accidents that could potentially merit therapy intervention.

29.   In their commitment to resident advocacy, therapists are encouraged to, among other things, re-evaluate residents who are receiving therapy less than five times per week and "analyze [their] clinical reasoning" for this frequency by asking "Am I truly able to address this resident's underlying impairments and identified needs at this frequency?"  Thus, SunDance asks its staff to continually question their own professional judgment in an effort to provide more services.

30.   "Medical necessity" does not appear in SunDance's descriptions of resident advocacy.  Rather, resident advocacy is a guise used by SunDance to charge for services not medically necessary in order to increase the profitability of its facilities.

31.   The SunDance resident advocacy philosophy comes from upper management.  SunDance training materials include a PowerPoint presentation instructing therapists that "due to the prevalence of medical complexities and cognitive decline," therapists should stage therapy goals in smaller incremental

11

steps and "anticipate" that progress toward the long term goals at discharge may require more than a 30-day certification period (*i.e.*, more than one Medicare billing cycle).

32.    The training slides also instruct that therapists "must" avoid a "cap mentality" over a concern of exceeding the annual Medicare cap for skilled therapy services and the denial of services.

33.    McAree is a licensed physical therapist who has worked in the skilled therapy field for over 20 years and has extensive experience in providing skilled therapy services to Medicare-eligible patients.

34.    McAree has worked in a wide variety of skilled therapy settings, including inpatient and outpatient, hospital, nursing home, and home health. Consequently, McAree is familiar with Medicare billing requirements and codes for skilled therapy services for both Medicare Part A and Part B.

35.    McAree began her employment with SunDance on June 1, 2010, as a 30-hour per week, full-time physical therapist.  Even though her job was for 30 hours a week, this was considered full time.

36.    McAree worked primarily in two different independent ALFs in the John's Creek, Georgia area–Sunrise Assisted Living and Belmont Village.

SunDance began providing services at the Belmont Village location in July 2010, shortly after McAree began her employment with SunDance.

37.    Sargam Arora served as one of SunDance's two Atlanta Area Managers, overseeing 18 facilities in which SunDance provided services.

38.    Denise Johnson served as SunDance's Regional Director of Operations for Alabama, Tennessee, Kentucky, Florida, and Georgia.

39.    From the outset of her employment at SunDance, McAree became aware of a tension between SunDance's "resident advocacy" philosophy with respect to treatment and "medical necessity," the standard by which McAree was required to base her clinical decisions.

40.    One of McAree's day-to-day responsibilities at the facilities was to screen potential patients. A screen included a brief chart review and interview of a patient to determine if the patient qualified for an initial evaluation and plan of therapy. If, in the clinical opinion of the evaluating therapist, a course of therapy was medically necessary, the therapist would seek a doctor's order for an evaluation. Medicare does not pay for screens and SunDance does not charge for screens.

41.    According to SunDance training materials, "every resident deserves the chance to return/maintain their [prior level of function] through skilled therapy

13

intervention, so...why <u>not</u> evaluate the resident." Thus, the SunDance training regarding screens employed a "why not" approach rather than a determination based on medical necessity.

42. Other "coaching strategies" provided by SunDance to therapists discussed low screen-to-evaluation conversions. These strategies asked if a staff member who was "struggling with screen conversions" was "selling a resident short" with respect to therapy and asked whether the staff member was "reluctant to give all residents with a functional decline a chance to improve."

43. In other training materials, SunDance advised that a screen should take less than fifteen minutes and, if the process took longer, it "may be an indication that an evaluation is warranted."

44. Shortly after McAree began her employment with SunDance, she came under fire by Arora for her screen-to-evaluation ratio. In Arora's opinion, McAree's screen-to-evaluation ratio was not high enough. Arora explained to McAree that the purpose of screens was not to decide which residents needed skilled services, but instead, to decide which skilled services the residents needed. According to Arora, if a patient was referred for screening, then he or she must need therapy.

45.    Arora's opinion and SunDance training materials, however, are not the clinical approach to screens. Instead, medical necessity underpins whether a screen will result in an evaluation.

46.    McAree was especially pressured to build caseload (*i.e.*, perform screens to get more patients on a course of therapy) at the recently-opened Belmont Village facility. In July 2010, McAree performed seven screens (off a longer list of residents provided to SunDance by the Belmont Village nurse at Arora's request) of residents who may potentially need therapy services. McAree concluded that two to three of these seven may need therapy.

47.    Lisa Griffin, the Therapy Program Manager for the Sunrise and Belmont Village facilities, informed McAree that she and Arora were upset that McAree had not come up with more potential referrals at Belmont Village and that she did not trust McAree's professional judgment.

48.    SunDance therapists, including McAree, were under constant pressure by management to admit patients in order to build caseload, even if just for normal aging issues that might not rise to the level of medical necessity, such as decreased balance, chronic pain, and difficulties with activities of daily living, or to prescribe a therapy course or frequency that was not merited for a particular patient.

15

49. Indeed, management routinely requested all three kinds of skilled therapy (physical, occupational, and speech) for almost every patient, regardless of an established medical need for all three, because management knew physicians would sign off on the orders without medical necessity having necessarily been established. Arora told Griffin "anyone who needs physical therapy, we'll go ahead and get occupational therapy orders too, so that we can build caseload." Thus, in an effort to build caseload, therapists were required to get orders for certain kinds of therapy, even if a screen by a licensed therapist had not identified a medically necessary need for those skilled services. According to McAree, Griffin would often check all boxes on an order request (for all three kinds of therapy) and a doctor would sign off on it.

50. Once a patient was on caseload, therapists, including McAree, were intimidated and harassed at the behest of Arora, under the guise of "resident advocacy," into increasing a patient's length of stay and number of therapy sessions per week.

51. For instance, Arora criticized McAree for discharging patients from the Belmont facility in August when the SunDance office at that facility had only opened in July. When criticized for this, McAree explained that no medical necessity merited a longer length of stay.

16

52.     Again, SunDance training materials regarding frequency of therapy reminded therapists that most residents "have access to a Medicare Part B benefit for the provision of skilled therapy services." Medical necessity, however, not a patient's insurance carrier, provides the basis for a patient's course and frequency of therapy.

53.     At a September 2010 staff meeting, Arora directed several comments to McAree regarding McAree's concern over increased lengths of stay and frequency of visits including comments such as "What are you afraid of? Medicare will pay for quality of life. SunDance will defend you in court. I have been to court many times; SunDance will support you. I have never had a decision where the courts have not recognized that quality of life is important."

54.     Arora continued to find fault with McAree's performance as it related to lengths of stay and frequency of visits. In November 2010, Arora requested that a member of the management team, Senior Clinical Specialist Braxton Crosby, meet with McAree and Colleen Youtsey, the physical therapy assistant who performed skilled physical therapy treatment with McAree.

55.     This meeting was prompted because of a disagreement McAree and Youtsey had with Griffin over a particular patient who was receiving both physical therapy with McAree and Youtsey and occupational therapy with Griffin. This

17

patient had been seen for two certification periods and the patient's course of physical therapy had focused on balance and gait. Just as the patient was about to be discharged, Griffin, who is a certified occupational therapist assistant ("COTA") and had been handling the patient's upper extremity therapy, concluded that the patient had shoulder pain and needed a longer course of physical therapy to include modalities. Modalities are a treatment tool that physical therapists may use to help strengthen, relax, and heal muscles, including hot packs, cold packs, and electrical stimulation. As a COTA, Griffin could not administer modality treatment, but McAree as a physical therapist, could. McAree did not believe the patient, who had never complained of shoulder pain in the course of physical therapy with McAree, necessitated modality treatment.

56.     In his report about the meeting, Crosby noted that he had met with McAree and Youtsey at Arora's request "to work with staff... concerning...frequency/duration of" plan of care. In addition, Crosby evaluated the patient's shoulder and concluded that the patient did not need more therapy for the shoulder.

57.     Despite McAree's opinion as a licensed physical therapist that medical necessity did not support longer lengths of stay or a higher frequency of

visits for every single patient, on December 20, 2010, Arora placed McAree on a developmental plan with a mentor, Julia Carver.

58.     When Arora discussed with McAree the need for her mentoring program, she repeatedly told McAree that she felt McAree did not embrace the SunDance philosophy.   According to Arora, more effectively embracing the SunDance philosophy meant that McAree needed to increase her patients' lengths of stay and her frequency of visits per week for her physical therapy patients.

59.     McAree was targeted because she was the evaluating therapist and controlled the plan of care (and, therefore, the lengths of stay and frequency of therapy).   Youtsey, as an assistant therapist, could not fill out the forms documenting the plan of care.   McAree and Youtsey, however, collaborated on every patient and every decision.   Youtsey approved of McAree's professional judgment with respect to each individual patient.

60.     The first item listed on McAree's written developmental plan was, six weeks after the plan's implementation, to follow up to determine if McAree had made a "change in resident advocacy" to be measured by the number of patients on case load, frequency of visits, length of stays, and the total number of physical therapy hours between McAree's two facilities.

61.    During McAree's employment with SunDance, Arora never offered specific criticisms of the treatment plans McAree and Youtsey established for individual patients, nor did Arora inform McAree how a longer length of stay or more frequent therapy visits were either medically necessary or helpful for patients to achieve the goals outlined in their plan of care. Likewise, no patients or their families complained about the treatment the patients received from McAree. Instead, Arora's primary criticisms of McAree were that she did not treat patients for enough visits per week and that her patients' lengths of stay were too short. Arora identified no functional goal or medical necessity missed by McAree and Youtsey.

62.    Carver, McAree's mentor, also identified no skilled clinical needs that McAree and Youtsey were missing with their patients.

63.    Carver's written evaluation of McAree to Arora from January 17, 2011, during her developmental period, indicated that McAree performed thorough and appropriate screens of patients and explained why the patient was or was not appropriate for an evaluation and course of therapy. For patients on caseload, McAree's documentation showed that patients achieved therapy goals within one certification period.

20

64.     In another written evaluation to Arora from February 9, 2011, Carver noted that McAree's charts adequately explained the prior level of function of the patients and the patients' long-term therapy goals in relation to their prior level of function.  Carver again noted that McAree appropriately conducted screens.

65.     Carver even noted that, based on her review of McAree's charts and observing patient treatment sessions with McAree, McAree did "embrace a resident advocacy approach."

66.     During McAree's developmental period, Griffin and Arora explained to McAree that SunDance was trying to "open her mind" to seeing patients for more than one certification period (*i.e.*, more than one Medicare billing cycle; thus, SunDance could charge for more visits).  Griffin pitched this as SunDance helping its therapists be the best therapists they can be.  This message came from upper management.

67.     Arora further asked McAree why she did not see patients five times a week.  McAree replied that if it were medically necessary, she would.

68.     Arora did not limit her demands of longer lengths of stay and frequency of visits to McAree.  Arora regularly met with therapy staff at all 18 of her facilities (which facilities billed under both Medicare Part A and Part B) to emphasize the necessity of increasing frequencies of visits for patients the

21

therapists evaluated.  Although she cited "resident advocacy" for her reasoning, Arora never offered concrete criticisms based on patient complaints or missed therapy goals or explained how medical necessity required these longer stays and more frequent visits.

69.   At a meeting on March 1, 2011, between Arora, Griffin, and McAree, McAree asked Arora why they needed to continue meeting, given mentor Carver's evaluations that McAree adequately and appropriately performed her job.

70.   In response, Arora showed McAree a revenue statement for the Sunrise building, which showed a dip in profits in the last quarter of 2010 (only a few months after McAree began working at SunDance).  Arora also showed McAree a separate sheet which showed the average lengths of stay per patient at the 18 individual buildings overseen by Arora.  Belmont Village and Sunrise (the two buildings where McAree worked) by far had the lowest.

71.   The information provided to McAree when she asked why her performance as a physical therapist continued to necessitate a developmental plan did not discuss individual patients, prescribed and approved plans of care carried out for each of these patients, or any information regarding the medical necessity that led to the plan of care.  Rather, the only information Arora provided to McAree concerned profits.

72.     McAree's situation was not isolated. Rather, therapists at SunDance regularly heard lines from management such as Arora "is not happy," and that if they did not build caseload, they would not have a job. Keeping up a daily threshold of productivity and billing for as much as possible was a constant concern.

73.     After the March 1, 2011 meeting, Arora required McAree to run her discharges through Griffin. Griffin, as a COTA, was not an evaluating therapist and not in the same discipline as McAree. Thus, Griffin did not possess the background and authority to determine if a patient should be discharged from another discipline.

74.     McAree and other therapists were repeatedly told to disregard the Medicare cap and use "strong codes" when billing for therapy services, including KX modifiers even when there was no indication that the cap likely was to be exceeded. In 2011, six patients in the two buildings where McAree worked had exceeded the cap by February, only two months into the calendar year. One of these buildings generally had a population of between 55 and 60 residents, while the other had about 80 residents.

75.     When McAree questioned Arora about the use of exception codes, Arora informed McAree that Medicare made a "mistake" and a "clerical error"

23

when it included physical and speech therapy in the same category for the Medicare cap. According to Arora, Medicare meant to include a comma, not a slash, between physical and speech therapy. According to Arora, Medicare created the cap exception codes to correct this clerical error.

76.    SunDance trained therapists to use the cap exception codes for any patient and simply write a "justification statement" to justify their use of an exception code, even if the exception did not apply.

77.    As a consequence of these tactics of harassment and intimidation, SunDance physical therapists were trained to completely disregard the Medicare cap.

78.    The SunDance philosophy of "resident advocacy" also included specific "core" therapy programs designed to increase the amount and kinds of therapy a patient received beyond what was medically necessary.

79.    Arora tracked the usage of these "core" programs, inquired into why certain programs were not utilized more, and required therapists to come up with a plan of how the programs would be utilized more.

80.    For instance, SunDance required therapists to hold at least one group therapy session every week. In her years of experience as a physical therapist, McAree had never been required to do this.

24

81.    SunDance therapists were pressured to target dementia patients for cognitive therapy, even though many of these patients were incapable of reaching cognitive goals.   Even if a skilled therapist completed a screen and deemed a dementia patient not appropriate for skilled therapy services, management pressured therapists to put these dementia patients on caseload with the rationale of "you don't know unless you try."   According to McAree, the training with respect to dementia patients ignored therapists' clinical expertise, judgment, and experience in favor of vague ideas not based on science.

82.    When McAree brought up her concerns regarding Medicare overbilling to Arora, Arora simply told McAree that Medicare would pay for quality of life.

83.    When continually faced with the tension between building caseload and medical necessity, McAree consistently stood her ground and explained her rationale for why her patients were discharged or why they were not seen more times per week:   that medical necessity did not warrant it.

84.    McAree took this stance at a March 3, 2011 staff meeting where Griffin re-explained the SunDance philosophy to therapy staff.

85.    On March 8, 2011, McAree submitted a complaint against SunDance to CMS.

86.     On March 15, 2011, McAree was formally reprimanded in writing for her behavior at the March 3, 2011 meeting because of her "negative attitude" towards the SunDance philosophy.     The write-up contained only vague characterizations and included no evidence of McAree's "negative attitude."

87.     On March 16, 2011, McAree was informed that Arora wanted to speak with her.  At this point and based on her recent write-up, McAree became concerned about the security of her job at SunDance.  That afternoon, she left a message with someone in Human Resources explaining her concerns.

88.     On March 17, 2011, Arora told McAree that SunDance had a "need" for a 40-hour-a-week physical therapist at Sunrise and Belmont Village and asked McAree to continue in her position, but work 40, instead of 30, hours a week. McAree refused to accept this proposal, as her job description was for a 30-hour a week therapist.

89.     McAree, concerned that management was attempting to force her out of her job, discussed her situation and her concerns regarding Medicare fraud with Human Resources Director Connie Pierce on March 18, 2011.  McAree asked whether the SunDance resident advocacy philosophy included billing for skilled services that are not medically necessary.

26

90.    McAree's continued questioning of Arora's methods prompted a March 23, 2011 conference call between Arora, Johnson, and Compliance Officer Debbie Pence, who is located in Maryland. The physical, occupational, and speech therapy staff were physically present at this meeting, while Pence, Arora, and Johnson appeared by phone.

91.    During the call, it was decided that six random charts from the John's Creek facilities would be chosen for a remote compliance audit to be performed by Pence. The reason for this audit stemmed from concerns that McAree had voiced to SunDance Corporate and Johnson.

92.    At a March 30, 2011 meeting with the therapy staff, Johnson (upper management) claimed that profits were the last concern of SunDance, but she continued to emphasize the business aspect. She took it even further, contending that ALFs and ILFs were turning into what nursing homes used to be, so therapists should treat patients in ALFs and ILFs more like SNFs. Patients in SNFs, however, already have established the requisite illness or injury to qualify for therapy. That is, a patient cannot go to an SNF without having such a condition, whereas, a patient in an ALF or ILF does not necessarily have a qualifying illness or injury for a course of skilled therapy. Thus, the two kinds of facilities are not equal.

27

93.     McAree did not find out the results of the remote chart audit because she tendered her resignation, agreeing to work an additional two weeks, in April 2011.

94.     On April 15, 2011 (a week into McAree's final two weeks), Arora contacted McAree and told her she accepted the resignation, but to stop seeing patients immediately. SunDance agreed to pay McAree for her final week, but instructed that she no longer see patients. McAree was given no explanation for this turn of events. She had no exit interview.

95.     Later, on May 28, 2011, McAree received a postcard from SunDance in the mail advertising her former job at 30 hours a week for the John's Creek facilities, full-time, despite the supposed "need" for a physical therapist for 40 hours a week.

96.     As evidenced by Arora's focus on only profits (rather than medical necessity or the number of patients in each facility), SunDance embraces a business plan that relies on a certain number of chargeable therapy hours in order to fiscally maintain each satellite office.

97.     A speech therapist told McAree that she estimated that only thirty percent of her clients were actually appropriate clients, *i.e.*, patients who were receiving treatment that was medically necessary and required the skills of a

28

speech therapist. This therapist felt pressure to build caseload because she did not want to lose her job.

98.     When McAree deferred to her professional judgment in decision-making instead of following SunDance's business plan, she was put on a sham developmental plan to "mentor" her into prescribing medically unnecessary therapy.

99.     McAree is aware of another therapist who was put on a similar development plan as her at another of Arora's facilities.

100.    The SunDance philosophy of resident advocacy causes its employees to fraudulently bill in these specific ways:

> (a)     Billing for maintenance and unskilled services. SunDance employees, as a purported courtesy, lead the daily exercise class in many of the facilities at least once per week. SunDance employees are trained to bring patients currently on caseload to the exercise classes (which are open to and attended by any willing resident, whether or not on caseload) so that the resident on caseload can be charged to Medicare as skilled therapy. A general exercise class, however, is not skilled therapy and is not

29

appropriately charged as group therapy because the group was not designed for the specific residents being charged.

(b)   Billing for therapy plans of care without proper physician oversight.   Medicare regulations require that a therapy plan of care be certified and established by a physician.   In some instances at SunDance, a physician is involved only by faxing a certification order.   The physician does not actually see the patient to know if the plan of care is necessary or appropriate.

(c)   Billing for lengths of stay and frequency of therapy that is not justified by medical necessity.

(d)   Billing for services over the Medicare cap without medical necessity and without required consent.   When the therapy cap is exceeded, SunDance employees are trained to write a justification statement using a "strong" cap exception code and continue billing Medicare, even in the absence of medical necessity.   Patient or patient power of attorney consent is required to continue billing for skilled therapy above the cap.

## Count One - False Claims Act
### (Presentation of False Claims)

101.  The allegations of Paragraphs 1 through 100 are incorporated by reference herein as if each is fully set forth.

102.  SunDance engaged in a pattern of abuse and intimidation of its therapists in order to make them bill Medicare Part A and Part B for services that were not medically necessary.

103.  SunDance engaged in this systematic pattern under the guise of "resident advocacy" and trained therapists to ignore and abuse Medicare rules and regulations, including but not limited to those violations listed in Paragraph 100 above.

104.  As a result of these training and intimidation tactics, SunDance knowingly presented false or fraudulent claims for payment or caused false or fraudulent claims to be presented to officers or employees of the United States Government, in violation of 31 U.S.C. § 3729(a)(1).  As a result of SunDance's conduct, the United States suffered actual damages.

## Count Two - False Claims Act
### (Presentation of False Statements)

105.  The allegations of Paragraphs 1 through 104 are incorporated by reference herein as if each is fully set forth.

106. SunDance trained its staff to extend therapy lengths of stay and frequencies of visits beyond what is medically necessary under the guise of "resident advocacy" and quality of life.

107. SunDance knowingly made or used, or caused to be made or used, false records or statements in order to get the payment or approval of false or fraudulent claims, paid or approved by officials of the United States Government in violation of 31 U.S.C. § 3729(a)(2). As a result of SunDance's conduct, the United States suffered actual damages.

## **Count Three - Payment by Mistake of Fact**

108. The allegations of Paragraphs 1 through 107 are incorporated by reference herein as if each is fully set forth.

109. As a result and consequence of the aforesaid conduct, the United States paid SunDance for Medicare Part A and Part B claims for which SunDance was not entitled, since the Medicare Part A and Part B claims were not properly reimbursable.

110. At the time, the United States made such payments, government officials were unaware of the wrongful conduct of SunDance. Had the United States known that SunDance was not entitled to receive reimbursement or payment

32

under Medicare Part A and Part B for the medical services, the United States would not have approved the payment of such funds.

111. As a result of the aforesaid acts, omissions, and conduct, the United States is entitled to recover the funds paid to SunDance by mistake.

## Count Four - Retaliatory Constructive Discharge

112. The allegations of Paragraphs 1 through 111 are incorporated by reference herein as if each is fully set forth.

113. McAree was forced to resign from her job at SunDance because of the intimidating and harassing treatment she received from upper management when she voiced concerns about SunDance's Medicare billing practices.

114. McAree could not perform her job as a physical therapist under the standards governing therapists without having her professional judgment questioned.

115. McAree's developmental plan was nothing more than a sham to attempt to make McAree see more patients (even if medical necessity did not require it) for services that were not medically necessary.

116. The actions taken against McAree, which resulted in her constructive discharge, were motivated in substantial part by her questioning and reporting SunDance's Medicare billing practices to the Human Resources department.

33

117.   Pursuant to 31 U.S.C. § 3730(h), there is a specific cause of action for employees who are disciplined or discharged for their efforts at taking steps "in furtherance of action under this section." McAree's conduct in questioning billing practices at staff meetings and reporting violations to the Human Resources department, as identified in the factual allegations above, was done in furtherance of an action within the meaning of § 3730(h).

118.   The on-site pressures and harassment received by McAree, which eventually resulted in her constructive discharge, entitles her to relief specifically described in § 3730(h).

## **Prayer for Relief**

WHEREFORE, the Plaintiff, Teresa McAree (Relator), acting on behalf of and in the name of the United States of America, demands and prays that judgment be entered in favor of the United States and against Defendant SunDance   on Counts One through Four of the Complaint as follows:

1.   On Count One - False Claims Act (Presentation of False Claims), for treble the amount of damages suffered by the United States plus civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim.

2.      On Count Two - False Claims Act (Presentation of False Statements), for treble the amount of damages suffered by the United States plus civil penalties of Ten Thousand Dollars ($10,000.00) for each false statement or false record.

3.      On Count Three - Payment by Mistake of Fact, for the return of all government funds paid by mistake or through the erroneous acts of the Defendant plus pre-judgment interest.

4.      For all accrued interest, costs and attorneys' fees.

5.      For such other and further relief as the Court deems just and equitable.

**MOREOVER**, Relator on her own behalf demands and prays that an award be made in her favor as follows:

a.      For 25% of the proceeds collected by the United States, if the United States intervenes in and conducts this action, or, for 30% of the proceeds if the United States does not intervene;

b.      For an amount for reasonable expenses necessarily incurred by the Relator in the prosecution of this action;

c.      For all reasonable attorneys' fees and costs incurred by the Relator in connection with these proceedings; and

d.      For such other and further relief to which the Relator may show that she is justly entitled.

35

## **Demand For Jury Trial**

McAree demands that this case be tried before a jury.

This the 7th day of December, 2012.

Paul L. Fields, Jr.
Georgia Bar No. 003420
pfields@fieldshowell.com
Hillary E. Harshman
Georgia Bar No. 129808
hharshman@fieldshowell.com
Fields Howell LLP
191 Peachtree Street, NE
Suite 4600
Atlanta, Georgia 30309
Telephone: 404.214.1250
Facsimile: 404.214.1251

36

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify under the penalties of perjury that on this 7th day of December 2012, we caused a copy of the foregoing Complaint for Money Damages and Civil Penalties under the False Claims Act and Common Law, and Relator's Disclosure Statement of Material Evidence and Information, to be served by registered or certified mail to: The Honorable Eric Holder, Attorney General, United States Department of Justice, 10th & Constitution Avenue, N.W, Washington, D.C. 20006 and by delivery to: Sally Quillian Yates, United States Attorney, Northern District of Georgia, and to Assistant United States Attorney, Amy Berne, United States Attorneys' Office for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Spring Street, S.W., Suite 600, Atlanta, Georgia 30303-3309.

Paul L. Fields, Jr.
Georgia Bar No. 003420
pfields@fieldshowell.com
Hillary E. Harshman
Georgia Bar No. 129809
hharshman@fieldshowell.com
Fields Howell LLP
191 Peachtree Street, NE
Suite 4600
Atlanta, Georgia 30309
Telephone: 404.214.1250
Facsimile: 404.214.1251